UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

FILED

02 MAY 31  AM 9: 07

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **PAMELA SUE JONES,** | ] | |
| Plaintiff, | ] | |
| vs. | ] | CV-00-N-3646-W |
| **DILLARD'S, INC.,** | ] | |
| Defendant. | ] | |
| **SARAH CROCKER, ET AL.,** | ] | |
| Plaintiffs, | ] | |
| vs. | ] | CV-00-N-3647-W |
| **DILLARD'S, INC.,** | ] | |
| Defendant. | ] | |

ENTERED

MAY 3 1 2002

## MEMORANDUM

### I.   Introduction.

In August, 1998, defendant Dillard's, Inc., purchased a Gayfer's department store in

Tuscaloosa, Alabama, from Mercantile Stores Company.  Plaintiffs in this consolidated

action are former Gayfer's employees who continued to work for Dillard's after the buyout.

All of the plaintiffs claim that Dillard's discriminated against them on the basis of their age

in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (2002)

("ADEA") and the Alabama Age Discrimination Act, Ala. Code §§ 25-1-20 to -29 (2001)

("AADA").  Plaintiff Gibbons asserts additional claims under Title VII for race, gender, and

religious discrimination and retaliation.  Plaintiff Byrd asserts an additional state law fraud



claim. The court has both diversity and federal question subject matter jurisdiction over this action. Presently before the court is Dillard's motion for summary judgment against all the plaintiffs, filed April 1, 2002. [Doc. # 12.] The issues raised therein have been fully briefed by the parties and are now ripe for determination. Upon due consideration, the court finds that the defendant's motion is due to be granted.

## II.    Facts.[1]

### A.    The Sales-Per-Hour Program

While employed by Gayfer's, employees were provided with an annual wage increase regardless of their performance. Dillard's, on the hand, utilized an incentive-based pay program known as the Sales-Per-Hour ("SPH") Program that provided sales goals for employees. The SPH Program governed the pay of all sales associates except those who worked in the Men's and Women's Shoe Departments and in the Men's Suits Department; those sales associates were paid on a commission basis. Employee performance under the SPH Program was measured every six months.

The SPH Program had "Standard Goals" and "Raise Goals" that were based upon an employee's hourly rate; the higher the employee's hourly wage, the higher the sales per hour goal. The SPH Standard Goal was the dollar volume of sales a sales associate was required to average for each hour worked on the sales floor to justify his or her pay. The SPH Raise Goal represented the dollar volume of sales that an associate should average on

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record as to those alleged facts that either of the parties claim to be in dispute. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

a per-hour basis during a review period to justify an increase in pay.[2]  Dillard's made seasonal adjustments to the selling standards so that an employee had lower sales goals in a slow month, such as February, than in a busy month, such as December.  The SPH Raise Goal was normally 10% higher than the SPH Standard Goal.

If a sales associate met his or her SPH Raise Goal for a given review period, the employee was entitled to a raise of at least twenty-five cents per hour.  If a sales associate met his or her SPH Standard, but did not meet the SPH Raise Goal, the employee remained at the same rate of pay.  If a sales associate failed to meet the SPH Standard for a given review period, the employee's hourly rate would be reduced by 10%.  If a sales associate received a pay increase or decrease, he or she was given new SPH Standard and Raise Goals for the next review period that were based on the employee's new rate of pay.  If a sales associate continued to fail to meet SPH Standards, the employee's pay could be reduced downward to a rate that the employee's average SPH would support.  If a sales associate failed to achieve the SPH minimum standards for a Workcenter, the employee could be discharged.

---

[2] To determine the goals under the SPH Program, each Workcenter in the store was assigned a "selling cost."  The selling cost for a Workcenter reflected the percentage of sales that Dillard's had determined should be the maximum amount allocated to payroll expense for that Workcenter.  Selling cost calculations were based on nationwide historical sales data and were reviewed on an annual basis for possible modifications.  If a Workcenter was assigned a selling cost of 10%, that means that Dillard's had determined that it should spend 10% of the dollars earned from its sales from that Workcenter on payroll costs for that Workcenter.

As an illustration, the selling cost for Children's Shoes was 14% and the Selling Cost for Housewares was 10%.  The Children's Shoes Department had a higher assigned Selling Cost because it did not normally do as much volume in sales as the Housewares area.  Under the SPH Program, to derive an employee's SPH Standard (i.e., the amount of sales the employee must make on an hourly basis to support his or her pay rate), an employee's hourly wage was divided by the selling cost percentage for the employee's Workcenter.  If an employee made $10 per hour and worked in a Workcenter with a selling cost of 10%, then the employee's SPH Standard would be: $10 / 0.1 = $100 per hour.  An employee's age did not factor into the sales goals derived under the SPH Program; it was purely a mathematical formula centered around a sales associate's hourly rate.

3

When Dillard's began operating the Tuscaloosa Store in August of 1998, the SPH Program was not immediately implemented, and employees were paid for approximately five months at the same rate they had been paid as Gayfer's employees. Beginning in January of 1999, Dillard's initiated the SPH Program at the Tuscaloosa store. During the first few months of the program's operation, Dillard's provided all sales associates with a "grace period" to become familiar with the program. During the grace period, sales associates were provided with raises if they achieved their SPH Raise Goals, but were not subject to a reduction in pay if they failed to meet their SPH Standard Goal.

### B.   The Plaintiffs

#### 1.   Sarah Crocker

Sarah Crocker, who was born on September 26, 1929, worked for Gayfer's as a sales associate prior to beginning work for Dillard's. She was paid an hourly wage of $9.65 the last day she worked for Gayfer's. Crocker continued to work as a sales associate in the area known as "Women's World" after the Dillard's buyout. Crocker's job duties included waiting on customers, putting out new merchandise, and keeping the department in order. Crocker worked part-time for Dillard's, averaging approximately thirty hours per week. In November of 1998, after working for Dillard's for three months, Crocker was given a pay raise to $10.15 per hour. In February of 1999, Crocker was provided with an explanation of the SPH Program and was given an SPH Standard Goal of $169 and an SPH Raise Goal of $186. Crocker's SPH goals were seasonally adjusted for the period from February through April, 1999, to $171 and $188 respectively.

4

On May 27, 1999, Crocker received her first review under the SPH Program.  For her initial review period, Crocker had actual sales-per-hour of $165, which was 3.5% below her SPH standard of $171.  Crocker's wage was not affected during the May review, and she remained at the hourly wage of $10.15.  Her SPH standard remained at $169, but her SPH raise goal was reduced to $177 for the period ending October 30, 1999.  These goals were seasonally adjusted for the review period of May through October to $161 and $169, respectively.

On September 13, 1999, Crocker received a warning letter from her supervisor.  The warning letter stated that during the first half of the review period to be completed on October 30, 1999, Crocker had an actual SPH of $137 compared with a mid-review SPH Standard Goal of $158, when adjusted for seasonal shifts in sales volume. The warning letter stated: "during the second one half of your review period, you must increase your sales performance enough to bring your actual SPH for the entire review period up to standard. If you do not do this, you will be subject to a 10% reduction in your rate, or termination if your support rate with a reduction is less than the work center minimum."  Crocker Dep. at Ex. 10.

On November 1, 1999, Crocker submitted her notice of resignation in which she stated that she was retiring.  In her resignation notice, Crocker wrote that her last day to work would be November 27, 1999.  When Crocker made the decision to resign, she knew her pay was going to be reduced on November 28.  On November 17, 1999, Crocker was notified that her actual SPH for the period ending October 31, 1999, was $135, which was 16.1% below her SPH standard of $161.  Crocker was advised in the notice that effective

5

November 28, 1999, her hourly rate would be reduced from $10.15 to $9.15. When asked why she did not wait to see if things would improve after the first notice of a pay cut, Crocker stated "[b]ecause I didn't want to do the same work I was doing for a dollar less an hour." Crocker Dep. at 128.

### 2. Deborah Gibbons

Deborah Gibbons worked as a sales associate in Housewares at the time of the buyout and continued to work in that position thereafter. Gibbons made $9.00 an hour while working for Gayfer's. Initially, she was paid $10.00 an hour when hired by Dillard's and later was given a raise to $10.50 per hour.

As a sales associate in Housewares, Gibbons' pay was governed by the SPH Program. She understood that her pay could be increased or decreased depending upon whether she exceeded or fell below the standards under the SPH program. On February 15, 1999, Gibbons was given an SPH Standard Goal of $105 and an SPH Raise Goal of $116. The goals were seasonally adjusted for the period to run from February through April to $106 and $117 respectively. On May 29, 1999, Gibbons received a report that showed she had an actual SPH of $42, which was approximately 40% of her SPH Standard Goal of $106. Her hourly pay of $10.50 per hour was not reduced though she had failed to achieve the SPH Standard Goal assigned to her. For the period to run from May 2, 1999, through October 30, 1999; Gibbons's SPH Standard remained at $105, but her SPH raise goal was reduced to $110 per hour. Gibbons spoke to store manager, Scott Gallant, on August 21, 1999, about the possibility of moving into the linens area and she was allowed to move to that area.

6

In the Fall Season of 1999, Dillard's corporate management determined that there were too many sales associates in various Dillard's stores whose actual SPH figures were unacceptably low. Store managers were instructed to counsel any sales associates whose actual SPH was less than 70% of the average of the actual SPH achieved by the sales associates in their Workcenter. The requirement affected all Workcenters in all Dillard's stores. Sales associates were informed that they would be discharged if they did not increase their sales to a level so that their sales over the prior four to five month period were equal to or greater than 70% of the average SPH of Sales Associates in their Workcenter.

In September of 1999, Store Manager Scott Gallant advised Gibbons that if she did not bring her SPH up to the 70% figure by October 2, 1999, she would be discharged. Gibbons failed to improve her sales performance to 70% of the Workcenter average by October 2, 1999, and was discharged. Gibbons' last day to work for Dillard's was October 9, 1999. She was forty-seven years old at the time of her termination.

### 3.   Lana House

House began working for Gayfer's in 1972. She was employed full-time for Gayfer's in its Children's Shoe Department from 1982 until the buyout. She and all other sales associates in the Children's Shoe Department were required to meet SPH requirements. House was warned that if she failed to meet her sales goals she could receive a reduction in pay and/or disciplinary action up to and including discharge. She was paid at an hourly rate of $13.75 per hour and provided with an SPH Standard Goal of $98 and an SPH Raise Goal of $108. On February 12, 1999, House received seasonally adjusted SPH requirements

7

for the period from February through April to provide for SPH Goals of $99 and $109 respectively.

On May 24, 1999, House received her first performance review under the SPH Program. She had an actual SPH of $107 per hour, which exceeded her SPH Standard Goal of $99 per hour. Her sales did not exceed her Raise Goal of $109, however, and her pay remained at $13.75 per hour. During that same review, House was given her new SPH Goals for the period from May 2, 1999, through October 30, 1999. Because her pay did not increase or decrease, her SPH Standard Goal remained at $99, but her Raise Goal was reduced to $103. Those goals were seasonably adjusted for the period of May through October, 1999, to $97 and $102 respectively.

On November 8, 1999, House was provided with her SPH performance review for the period ending October 30, 1999. House had an actual SPH of $55 versus her SPH Standard Goal of $97. Because she did not meet her SPH Standard Goal, she was notified by her supervisor that her pay rate would be reduced from $13.75 per hour to $12.40 per hour effective November 28, 1999. House was also provided with her SPH requirements for the period beginning October 31, 1999 and ending on April 29, 2000. Because her pay was reduced, her SPH Standard Goal was reduced to $89 and her SPH Raise Goal was reduced to $98. House was advised that her pay could be returned to $13.75 per hour if her average SPH met or exceeded her Raise Goal. She was advised that if she did not achieve at least 90% of her SPH Standard Goal during the review period, her pay could be reduced to $11.20 per hour.

8

On May 5, 2000, House was presented with a performance review for the period ending April 29, 2000. She had an actual SPH of $54 versus an SPH Standard of $89. Given House's failure to meet her SPH Standard, her pay was reduced from $12.40 per hour to $11.20 per hour effective May 28, 2000. House's new SPH Standard was $93 and her Raise Goal was $102.The were seasonally adjusted to $92 and $101 respectively. On June 13, 2000, House submitted her notice of resignation, stating that her last day to work would be July 7, 2000. She decided to resign because she could not meet her sales goals and because of the associated stress. She was then fifty-four years of age.

### 4. James Thompson

Thompson began work for Gayfer's in 1979. At the time of the Dillard's buyout, he was working as a sales associate in the Housewares Department and was also doing general maintenance work for the store. Thompson made approximately $9-10 an hour at the time he worked for Gayfer's prior to the sale. He received a raise while working for Dillard's, and was making approximately $11 an hour at the time he was discharged. After beginning work for Dillard's, Thompson was allowed to choose between a full-time position as a sales associate in Housewares or a full-time position in shipping and receiving. Thompson chose the sales associate position.

In January of 1999, Thompson was given an SPH Standard Goal of $111 and an SPH Raise Goal of $122. On May 31, 1999, Thompson received his SPH performance review for the period ending May 1, 1999. He had an actual SPH of $38 per hour, which was less than 40% of his SPH Standard Goal. At that time, Thompson was given an SPH Standard Goal of $96 and a Raise Goal of $101 for the period ending October 30, 1999. (Thompson Depo., Ex.

7).  Despite his failure to achieve his SPH Standard Goal for this initial review period, Thompson was not subjected to a pay cut or any disciplinary action and remained at $11 per hour.

In September of 1999, Thompson met with Store Manager Scott Gallant and Steven McCreless, Department Manager for Housewares and was notified that he had failed to meet 70% of the SPH average achieved by associates in his Workcenter for the last seven months.  The Workcenter average for Housewares was $87 per hour; 70% of that figure was $60.90 per hour; and Thompson had an actual SPH of $46 per hour.  Thompson was told that he would be discharged if he did not improve his SPH to achieve 70% of the Workcenter average for the 7-month period by the close of business on Saturday, October 2, 1999.  He failed to do so and, on October 9, 1999, was discharged.  He was sixty-six years old at the time of his termination.

### 5.    Pamela Jones

Pamela Jones, who was born December 3, 1953, began working for Gayfer's in 1975.  At the time of the buyout, she worked as a sales associate in the Ladies Shoe Department She she continued in that position after the buyout.  When Dillard's took over Gayfer's, Jones was making $12.45 an hour.  Soon after the takeover in August of 1998, Jones was given a raise to $13 per hour.

As a sales associate in Ladies' Shoes, Jones was paid on a commission basis, earning a commission equal to 9.3% of the net sales that she made.  Jones was provided with a weekly draw against her commissions.  Under the draw system, Jones and other commissioned workers were advanced money each week for each hour they worked on

10

the sales floor at a specified hourly rate.  If the sales associate were to sell enough shoes

so that her commission exceeded her draw, she was provided with a commission check

in addition to the draw checks once a month.  Jones initially received a draw equal to $13.00

for each hour she worked on the sales floor.  Jones also did some non-sales work, such as

stock or merchandising, and was paid an hourly rate for that work under the "special hours"

classification.

On October 5, 1998, Jones was provided with a commission sales agreement which

provided the terms of her pay.  Her commission sales agreement expressly provided for

the actions that would be taken if a sales associate did not have enough sales to cover the

draw that the employee had taken:

> When you do not have enough NET SALES to cover your DRAW, the
> COMMISSION actually becomes a negative number and creates a DEFICIT.
> This DEFICIT will be carried over month to month, and any COMMISSIONS
> earned will reduce the DEFICIT by a corresponding amount.  Likewise,
> continued substandard performance will increase the DEFICIT total.  When
> the DEFICIT is reduced to zero, the COMMISSION  balance and/or future
> COMMISSION is paid. At no time will your DEFICIT condition be carried for
> more than an eight-month period in normal work centers . . .

> Whenever you have two [2] consecutive months with a DEFICIT condition,
> you will receive a documented warning that you are not earning your DRAW.
> If you continue to have a DEFICIT for three (3) consecutive months (total of
> ninety days in DEFICIT), your DRAW will be cut to a percentage of the
> amount supported by your NET SALES for the previous three month period,
> but in no case less than 1-1/2 times the minimum wage (see formula below).
> If you continue in deficit for six (6) consecutive months (total of 180 days in
> DEFICIT), your DRAW will be reduced to the commission minimum.

Jones Dep. at Ex. 8.

In the first months that Jones worked under her commission sales agreement, her

sales exceeded her draw and she was paid additional commission checks.  On July 9, 1999,

11

Jones received a sixty-day warning letter stating that her draw had exceeded the commission she had earned on her sales for the past two months by $803.37. She was told in the letter that if she did not reduce her deficit during the current month then her draw would be reduced to help off-set the deficit. Jones acknowledges that her supervisors allowed her additional time on the floor to sell shoes to help increase the commission that she earned so as to off-set her deficit. On August 12, 1999, Jones received a ninety-day draw reduction letter noting that over the last three months, her draw had exceeded her commission earned by $759.40 and informing her that she would have a new reduced draw rate of $7.75 to help off-set the deficit.[3]

Jones completed an employment application with Regions Bank on September 15, 1999, approximately one month after receiving notice that her draw would be reduced. In her application, she stated her reason for wanting to leave Dillard's as being "need a change." Jones was offered a job with Regions Financial Corp. on September 15, 1999, and she accepted the offer. On September 23, 1999, Jones submitted her notice of resignation to Dillard's, stating that her last day of employment would be October 7, 1999. She was forty-five years old at the time she resigned.

Jones claims that Operations Manager Andy Poole, who was also a former Gayfer's employee, told her that "Dillard's would eventually get rid of people my age." Jones Dep. at 79. She also claims that Poole told her that "Dillard's would get rid of all the Gayfer's

---

[3]To calculate a reduced draw rate, Dillard's took the amount of sales that a sales associate actually had and divided it by the hours worked during that same time period. That figure is then multiplied by 0.8 to give the new draw rate unless the new draw rate was below the Workcenter minimum, in which case the new draw rate became the Workcenter minimum.

Mercantile people." Jones Dep. at 82. Poole never identified any particular person or persons in Dillard's management who he believed had expressed animus toward older employees. Jones Dep. at 83. During her deposition, she could not remember whether Poole told her of any facts upon which he based his belief that Dillard's might want to get rid of older workers. Jones does not remember any members of Dillard's management making any derogatory remarks to her about her age.

### 6.   Gerda Byrd

When Dillard's acquired the Tuscaloosa store in August, 1998, Gerda Byrd worked as the store Credit and Office Managers. Those positions did not exist in the Dillard's management scheme. Byrd was offered a choice of remaining in Customer Service, at a lower rate of pay, or taking a position as Assistant Area Sales Manager ("AASM") at the same pay she had received as Credit Manager and Office Manager, $600 per week. She chose the AASM position. Under Dillard's Associate Work Rules, Byrd and all other sales associates were employed on an "at will basis," and "[b]oth an associate and the Company have the right to terminate the employment relationship at any time, for any reason or no reason, as long as the termination does not violate Federal or State statutes." Crocker Dep. at Ex. 4.

The salaries of Assistant Area Sales Managers and Area Sales Managers were charged to the Sales Management Expense Account. Dillard's contends that in 1999, it requested the Tuscaloosa store and other stores to reduce the Sales Management Expense Account costs to a number less than 1% of the store's sales. Dillard's further alleges that the Tuscaloosa store payroll for Area Sales Managers and Assistant Area sales Managers

13

exceeded 1% of sales, so District Manager Gary Wirth decided to eliminate the Assistant Area Sales Manager positions in the Tuscaloosa store.

Richard Lucas, who had worked as an AASM at the Tuscaloosa store, was moved into shipping and receiving. Byrd was offered a position selling cosmetics at the Clinique counter in the Tuscaloosa store. She declined the position in Cosmetics because she knew the position would eventually entail having to maintain an SPH goal, which she felt she would be unable to meet because she had no experience in the Cosmetic Department. She asked Store Manager Scott Gallant and District Manager Gary Wirth for a severance package in late April or early May, 1999. Mr. Wirth arranged for a severance package for her, consisting of payments of $600 per week for 47 weeks, beginning after her last paycheck and continuing into 2000. She was fifty years old at the time of her resignation.

Gerda Byrd testified in her deposition that Andy Poole, Operations Manager for the Tuscaloosa Dillard's store, told her in June, 1999, that Scott Gallant (then Store Manager) had told him to look for two candidates for AASM within the store. In August, 1999, Area Sales Manager Linda Reynolds resigned from Dillard's to take other employment. Reynolds' salary had been charged against the Sales Management Expense Account, so, according to Dillard's, her departure permitted hiring an AASM. In September, 1999, Tiffany Winters applied to the Tuscaloosa Dillard's store seeking a position in sales management. Ms. Winters was hired in October, 1999, as an AASM. Byrd testified that after Winters was hired, Andy Poole told her that "when he saw Tiffany Winters walk in his office, he said she was young and pretty, and he just had to hire her." There were no AASMs in the

14

Tuscaloosa Dillard's store from the time of Gerda Byrd's resignation in May, 1999, until Tiffany Winters' hiring in October, 1999.

## III.   Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movants can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.   Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The substantive law

15

will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.   Discussion.

### A.   Introduction

In their complaint, the plaintiffs asserted a number of claims against Dillard's. Crocker alleged that Dillard's violated the ADEA by decreasing her pay, constructively discharging her, and maintaining a hostile work environment. She also alleged that Dillard's violated the Alabama Age Discrimination Act. House and Jones asserted the same four claims as Crocker. Thompson alleged that Dillard's violated the ADEA by terminating him and maintaining a hostile work environment, and that Dillard's violated the Alabama Age Discrimination Act. Gibbons alleged the same three claims as Thompson, and further

16

alleged that Dillard's violated Title VII of the Civil Rights Act of 1964 by discriminating against her on the basis of her race, gender, and religion, and by retaliating against her. Byrd alleged that Dillard's violated the ADEA by inducing her to resign and maintaining a hostile work environment.  Byrd also alleged that Dillard's violated the Alabama Age Discrimination Act and committed fraud in the inducement.  Finally, the plaintiffs included a catch-all count alleging discrimination by Dillard's against them and similarly situated individuals at the end of the complaint.

In its motion for summary judgment, Dillard's sought judgment as to each and every claim.  In response, the only claims that the plaintiffs sought to protect from Dillard's motion were (1) Crocker's, House's, and Jones' pay reductions in violation of the ADEA; (2) Thompson's and Gibbons' terminations in violation of the ADEA; (3) Byrd's transfer in violation of the ADEA; and (4) all of the plaintiffs' state law claims.  Because they were silent as to their remaining claims, plaintiffs shall be deemed to have abandoned them.[4]  The remaining claims are discussed below.

As an initial matter, the court notes that both parties seem to accept that the standards applicable to claims brought under the federal ADEA are applicable to claims brought under the Alabama Age Discrimination Act.  *See* Ala. Code § 25-1-29 (2001). Indeed, the only court, either state or federal, to have addressed this issue in a reported opinion has held that identical standards apply under the ADEA and the AADA.  *See Bonham v. Regions Mortgage, Inc.*, 129 F. Supp. 2d 1315, 1321 (M.D. Ala. 2001) (Thompson,

---

[4] The claims that plaintiffs have thus abandoned are all of their hostile environment claims, Crocker's and House's constructive discharge claims, Gibbons' Title VII claims, and their catch-all count appearing at the end of their complaint.

17

J.) ("[B]ecause it is self-evident that the AADEA's purpose and prohibition are like the ADEA's, to promote employment of older persons based on their ability rather than age and to prohibit arbitrary age discrimination in employment, it follows that [the principles governing the order and allocation of proof in ADEA and Title VII cases] should govern in AADEA cases as well.") As both parties have followed this approach, the court will examine the plaintiffs' federal and state age discrimination claims in a parallel and identical fashion, with the exception of Byrd's claims, which the court finds should be resolved separately.

### B.   Claims of Crocker, House, Thompson, Gibbons, and Jones

"In proving an age discrimination claim, a plaintiff can establish a prima facie case of discrimination through either direct evidence of discrimination or a variation of the four-part test outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), for circumstantial evidence." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (citing *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989)).  Direct evidence is evidence that, "if believed, would prove the existence of a fact [in issue] without inference or presumption." *Carter v. Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).  "'[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age' will constitute direct evidence of discrimination." *Damon*, 196 F.3d at 1359 (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990).  Furthermore, "[f]or statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision." *Trotter v. Board of Trustees of the Univ. of Ala.*, 91 F.3d 1449, 1453-54 (11th Cir. 1996).  Should a plaintiff produce direct evidence that discrimination motivated

the employment decision complained of, the defendant must prove that the same employment decision would have been made in the absence of the discriminatory motivation. *See id.*

Where there is no direct evidence of discrimination, a plaintiff is required to establish a presumption of discrimination by setting forth a prima facie case. *Chapman v. Al Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). One method of so doing is to show that he: "(1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual." *Id.* Upon such a showing, the burden shifts to the employer to set forth one or more nondiscriminatory explanations for the adverse employment action that it took in regard to the plaintiff. *Id.* This is a burden of production and not one of persuasion. *Id.* Should the employer be able to set forth such a reason, the inference of discrimination that was created by the prima facie case drops from the case and the burden returns to the plaintiff to show that the employer's proffered explanation is merely a pretext for age discrimination. *Id.* In responding to a defendant's legitimate, non-discriminatory reason justifying its complained-of action,

> [a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, *an employee must meet that reason head on and rebut it*, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Id.* at 1030 (emphasis added).

19

In the present case, plaintiffs Crocker, House, Thompson, Gibbons, and Jones have attempted to prove their case through both direct and circumstantial evidence. As for direct evidence, they point to three statements allegedly made by members of Dillard's management. First, they submit the affidavit of Andy Poole, Dillard's Operations Manager at the Tuscaloosa store during the relevant time frame, in which Poole states that District Manager Gary Wirth told him that the "Dillard's profile" needed to change. Even though Wirth "did not expressly state what he meant by 'Dillard's profile,'" Poole interpreted this statement to mean that Dillard's wished to hire younger employees. The actual statement that Wirth allegedly made to Poole is clearly not direct evidence because a fact finder would have to draw the inference that the undefined "Dillard's profile" would exclude older individuals. That Poole was forced to interpret the statement in order to give it any meaning illustrates the fact that the statement is, at best, circumstantial evidence and not direct evidence.

The plaintiffs also point to two statements that Poole himself allegedly made. First, he allegedly told Byrd that Tiffany Winters, the individual that he hired as an Assistant Area Sales Manager several months after Byrd's resignation, "was young and pretty" and that "he just had to hire her." This statement does not qualify as direct evidence because the plaintiffs have pointed to no evidence that Poole was an actual decision-maker in regard to the employment decisions that effected them and of which they now complain. While it is true that there is evidence that Poole was involved in the hiring decision of Tiffany Winters, which bears directly on Byrd's prima facie case, the actual decision of which Byrd complains is not the hiring of Winters, but her own transfer and subsequent resignation.

Winters' hiring, at best, serves as evidence of discrimination. It is not the act of discrimination itself.

The second statement of Poole's to which the plaintiffs point is the alleged remark that he made to Jones that "Dillard's would eventually get rid of people [her] age." Again, the plaintiffs have not pointed to any evidence that Poole himself was involved in any of the complained-of decisions at issue in this lawsuit. Moreover, the record is devoid of any basis upon which Poole rested this comment. Was it his feeling that Dillard's was trying to fire older employees? Was he in possession of actual facts backing up his belief? Did he base this belief on actual statements from an individual in a decision-making role? With these questions unanswered, the court refuses to find that Poole's statement to Jones constitutes direct evidence of a discriminatory motive that can be attributed to the relevant decision makers involved in the decisions of which the plaintiffs complain.[5]

As they have failed to put forward direct evidence of discrimination, plaintiffs Crocker, House, Thompson, Gibbons, and Jones must rely on the *McDonnell Douglas* burden-shifting framework. For the purpose of this motion, the court will assume that all five of these plaintiffs have established a prima facie case[6] and that the burden has shifted to

---

[5] In like fashion, Poole's remark in his affidavit that based upon his dealings with members of Dillard's management, "it became apparent to [him] that Dillard's wanted to hire employees who were willing to work for lower wages than many of the longtime Gayfer's employees," does not qualify as direct evidence of discrimination. At most, the statement indicates only Poole's interpretation of undisclosed interactions with other managers at Dillard's, not direct evidence of a discriminatory motive harbored by the decision makers relevant to the present case.

[6] Indeed, Dillard's does not dispute that Crocker, Thomson, House, and Gibbons have set forth a prima facie case as to their remaining discrimination claims. The court agrees with Dillard's that Jones probably cannot show that an adverse employment decision in that it was her weekly draw that was reduced, rather than the commission that she made on her sales. The court will assume that she has met her burden, however, because it is convinced that her claim, like those of the other four, fails at the pretext stage of the burden-shifting analysis.

21

Dillard's to produce a legitimate, non-discriminatory reason for taking the adverse actions that it did against them.  As to Crocker and House, Dillard's argues that their pay was reduced because they failed to meet the goals set under the Sales-Per-Hour Program.  As to Thompson and Gibbons, Dillard's argues that they were terminated for failure to achieve 70% of the average sales made by the sales associates in their respective work centers.  As to Jones, Dillard's asserts that because her draw exceeded the commission that she was earning on her sales, her draw was reduced in order to help repay the overages against her draw. Dillard's asserts that the programs under which the above actions were taken dictate that an employee's salary is tied directly to his or her performance and does not take the employee's age into account, either facially or as applied.

Because Dillard's has offered legitimate, non-discriminatory reasons for its actions in terminating or reducing the salaries of the plaintiffs, the plaintiffs are required to present evidence that the reasons asserted by Dillard's are merely a pretext for age discrimination. Because Dillard's proffered reasons are ones that could motivate a reasonable employer, the plaintiffs are not allowed to simply quarrel with the wisdom of the reasons that Dillard's sest forth, but must meet those reasons "head on" and rebut them, either by showing that Dillard's did not rely on the reasons it gave for taking the actions that it did, or by showing that a different reason motivated Dillard's actions.  This the plaintiffs have utterly failed to do.

Plaintiffs first argue that their goals under the SPH Program were unrealistic, "particularly given the low customer turnout and change in inventory at the store following the Dillard's takeover."  This argument does nothing more than quarrel with the wisdom of

22

Dillard's SPH Program, and is not evidence that Dillard's did not rely on its aforementioned reasons for taking the complained-of actions.  Plaintiffs argue that the SPH goals were heightened in the Tuscaloosa store, "suggesting that Dillard's meant to eliminate much of the longtime Gayfer's work staff at the Tuscaloosa store."  However, the evidence relied upon by the plaintiffs, the testimony of Gene Heil, a Dillard's Vice-President, reveals the following:

> Q. There was another component of the SPH formula that I guess kind of led to the termination of two of the plaintiffs in this case, James Thompson and Deb Gibbons.  Can you explain that 70 percent of work center average I believe is how y'all --
>
> A. I was not running the Tuscaloosa store at the time, so I can't specifically comment on their scenario.  I can only comment on how I understood the 70 percent in this situation to work at that time.
>
> Q. Okay.
>
> A. On a global or as far as I knew, a global scale.
>
> Q. Okay.
>
> A. I am sorry.
>
> Q. Tell me how you thought it worked --
>
> A. Senior management decided in mid season, mid fall season of 1999, that based on business conditions we had too many associates in various work centers in various stores that were not selling up to a minimum of 70 percent of the work center's sales per hour average for that particular store.  They believed and they instructed us to counsel these associates and tell them that they needed to get above 70 percent of the work center average in that store or face termination.
>
> . . . .
>
> Q. And you said senior management kind of focused in on certain work centers and certain stores, it was not across the board?

23

**A.** No, it was all work centers in all stores.

Heil Dep. at 64-67. The plaintiffs have failed to point to any evidence disputing Heil's account of the reasons behind the 70% requirement that led to Thompson's and Gibbons' dismissals and how that requirement worked.[7] While the plaintiffs have attempted to characterize the 70% requirement implemented by management as "an attempt to cut back on the number of sales associates in certain locations," the foregoing testimony clearly demonstrates that such was not the case.

The plaintiffs' foregoing arguments do not show that the SPH Program, or the commission program under which Jones' draw was reduced, were discriminatory on their face or as it was applied to them. Moreover, they have neither demonstrated that Dillard's did not rely on the reasons it set forth for having reduced their salaries or terminated their employment, or shown that a different reason more likely motivated Dillard's actions. As a result, they have failed to rebut Dillard's legitimate, non-discriminatory reasons and their claims fail as a matter of law.

## C.  Byrd's Claims

### 1.  ADEA Claim

Before reaching the merits of her federal discrimination claim, Dillard's asserts that Byrd did not file her charge with the EEOC within the requisite time and her claim in this court is therefore barred. It is undisputed that Byrd resigned from Dillard's in May, 1999,

---

[7] In regard to Gibbons, the plaintiffs put forth the further argument that she in fact met the 70% goal, outlined above, during the two weeks prior to her termination. It is undisputed, however, that her overall average for the entire review period in question was below 70%, in spite of her performance over the last two weeks of that period, and that her termination was based on her deficient performance for the entire period. *See* Def.'s Stmt. of Facts at ¶¶ 108, 110, 113, 115, and Plaintiffs' Response thereto.

24

but did not file a charge with the EEOC until February, 2000. The ADEA provides that "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such a charge shall be filed . . . within 180 days after the alleged unlawful practice occurred . . . ." 29 U.S.C. § 626(d)(1) (2001). This 180-day requirement is not jurisdictional; it operates like a statute of limitations. *See Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 660 (11th Cir. 1993). The Eleventh Circuit has clearly held, and both parties acknowledge, that the 180-day period begins to run when the plaintiff "suspects that he may have been discriminated against on account of his age and is also generally aware of his legal right to obtain redress for that wrong." *McClinton v. Alabama By-Products*, 743 F.2d 1483, 1487 (11th Cir. 1984).

When a defendant raises the 180 day limitations period, the plaintiff bears the burden of proving that the limitations period is subject to equitable tolling. *Ross*, 980 F.2d at 661. Instead of a direct tolling argument, Byrd argues that the time should not begin to run on her claim until October, 1999, the point at which she learned that Tiffany Winters, a younger individual, had been hired into the position of Assistant Area Sales Manager, because that was the first point at which she suspected that she had been discriminated against on account of her age. The court disagrees.

Dillard's points out that Byrd testified in her deposition that only a few weeks after she resigned her employment, on or around June 8, 1999, Andy Poole, then the Operations Manager at the Tuscaloosa store, told her that he had been instructed by Scott Gallant, General Manager at the Tuscaloosa store, to look for two new Assistant Area Sales

Managers.  According to her, she immediately recognized that Dillard's had lied to her about the reason she was relieved of her duties as AASM and transferred to cosmetics (that the AASM positions were being done away with).  Shortly after Poole informed her that he was instructed to look for new AASMs, Byrd wrote the following in a letter:

> On Tuesday 6-8-99 Mr. Andy Poole told me at Chillys [sic] Restaurant that Mr. Gallant told him, they had to find two new AASM's.
> This happens after I was told, the store could not afford any AASM's because they were not making their figures.  Seems to me, I was lied to!!!  As soon as I find out there are two new AASM' [sic] in place I will file a lawsuit against Dillards.  This lawsuit will be for Age Discrimination, and Wage discrimination.  Seems to me, they wanted to get rid of me, by demoting me to the floor, and after several paycuts, because I could not meet my SPH fire me.

Byrd Dep. at Ex. 2.  Earlier in the letter, she recounted that she had been concerned after Dillard's purchased the Tuscaloosa store because a number of the individuals being discharged were older.  Finally, in her deposition, she testified that while she was working at Dillard's, there was conversation among herself and the other workers that the older Dillard's employees were "getting the shaft" in regard to separation from the company.  Byrd Dep. at 72.

The Eleventh Circuit has stated that "[i]n order for equitable tolling to be justified . . . the facts must show that, in the period more than 180 days prior to filing their complaints with the EEOC, [the plaintiffs] had no reason to believe that they were victims of unlawful discrimination."  *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 660 (11th Cir. 1993); *see Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1435 (11th Cir. 1998).[8]  While the facts

---

[8]The court is aware of the Eleventh Circuit's holding in *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023 (11th Cir. 1994), in which the Court appeared to state that one is not in possession of sufficient facts to start the running of the 180-day period until he is aware of the age of the individual replacing him.  A close reading of that case indicates, however, that when one is aware that he is being replaced by an individual outside of the protected

indicate that Dillard's *may* have misled her regarding the reason she was transferred to cosmetics, she plainly had reason to believe that Dillard's reason for transferring her were not true.  Her deposition testimony regarding her pre-resignation discussions with other Dillard's employees and what she wrote shortly after allegedly learning that she had been deceived by Dillard's clearly demonstrate that prior to the 180-day period leading up to her EEOC charge, she had reason to believe, and actually did believe, that Dillard's had discriminated against her on the basis of her age in violation of the ADEA.  Thus, her ADEA claim is barred.  *See Barnes v. Hillhaven Rehabilitation and Convalescent Center*, 686 F. Supp. 311, 314 (N.D. Ga. 1988) (holding that running of 180-day period in which to file charge is not tolled until the plaintiff learns the age of his or her replacement).

### 2.    Alabama Age Discrimination Act Claim

Dillard's argues that Byrd's age discrimination claim brought pursuant to state law is also barred by the running of the limitations period.  Alabama Code § 25-1-29 provides:

> [T]he . . . statutes of limitations, under this article shall be the same as those authorized by the federal Age Discrimination in Employment Act except that a plaintiff shall not be required to pursue any administrative action or remedy prior to filing suit under this article.

Ala. Code § 25-1-29 (2001).  Dillard's points out that there are two time limits in the ADEA: an aggrieved individual must file a charge of discrimination with the EEOC within 180 days

_____

class, he is certainly in possession of sufficient facts to begin the running of the 180-day period.  The court did not hold that the converse of this statement is necessarily true.  Moreover, the facts of *Sturniolo* are easily distinguishable from the present case, because in *Sturniolo*, the plaintiff "assert[ed] that he believed [his manager]'s stated reasons for the termination and did not have cause to doubt these reasons until several months after his discharge when [the plaintiff] confirmed that [the defendant] hired a younger individual [into his former position]."  *Id.* at 1025.  In the present case, as the record demonstrates, Byrd clearly had cause to doubt the reasons given for her transfer to cosmetics within only a few weeks of her resignation, and long before the beginning of the 180-day period leading up to her filing of a charge with the EEOC.

of the complained-of event and must file his or her complaint in federal court within 90 days of receiving his or her right to sue letter from the EEOC. It argues that because these are the only limitations periods present in the ADEA, the Alabama legislature clearly intended that parties filing suit under the AADA are subject to, at the longest, a 180-day statute of limitations. Dillard's asserts that because the ADEA's former two-year statute of limitations was repealed well before the Alabama legislature passed the AADA, the legislature clearly did not intend a two-year statute of limitations to apply to actions brought pursuant to the AADA.

The plaintiffs respond that the limitations periods appearing in the ADEA are not statutes of limitations in the traditional sense but, instead, serve only as administrative deadlines. These deadlines are inapplicable, the plaintiffs argue, because the AADA clearly does not require aggrieved parties to take any administrative action prior to filing suit. As the ADEA therefore does not provide to the AADA a statute of limitations, Alabama's general two-year statute of limitations for those torts not enumerated in Ala. Code § 6-2-38 applies to AADA actions.

The court agrees with Dillard's. When debating and passing the AADA, the Alabama Legislature was certainly in possession of the knowledge that the two-year statute of limitations that had formerly applied to the ADEA had been repealed by Congress and that the only limitations periods remaining in the ADEA were the 90-day deadline by which to file suit after receipt of a right to sue letter and the 180-day deadline by which to file a charge of discrimination with the EEOC. As noted in the previous section, case law has made clear that these deadlines are not jurisdictional but, instead, serve as a form of statute

of limitations, complete with the power to entirely bar suit on an otherwise valid discrimina-
tion claim.  The Legislature presumably knew that the courts had treated these deadlines
as statutes of limitations when it chose to adopt the "statutes of limitations . . . authorized by
the federal Age Discrimination in Employment Act" for the AADA.  The clear import of Ala.
Code § 25-1-29, then, is to adopt, at the longest, a 180-day statute of limitations for actions
brought pursuant to the AADA.  As a result, for the reasons discussed above, Byrd's AADA
claim is barred.

### 3.    Fraud Claim

Byrd finally asserts a state law fraud in the inducement claim.  The crux of this claim
is that Dillard's misrepresented to Byrd that it was ending the position of Assistant Area
Sales Manager and transferred her to a position that it knew she would not accept in order
to induce her to resign her employment with Dillard's.  Under Alabama law, the elements
of fraudulent misrepresentation are: (1) a misrepresentation of a material fact; (2) made
either innocently or willfully to deceive or recklessly without knowledge; (3) which under
the circumstances was reasonably relied upon by the plaintiff; and (4) which caused injury
as a proximate consequence.  Ala. Code § 6-5-101 (2001); *Brushwitz v. Ezell*, 757 So. 2d 423,
429 (Ala. 2000).  Dillard's argues that its representation that it was eliminating the AASM
positions in the Tuscaloosa store was true at the time it was made, and that the positions
were not reestablished until money in the budget was freed up by the resignation of an Area
Sales Manager, several months after Byrd resigned.  It also argues that Byrd did not rely on
its statement that it was eliminating her AASM position, that any reliance was unreasonable
as a matter of law, and that she did not suffer any cognizable damages.

In *Boackle v. Bedwell Construction Co., Inc.*, 770 So. 2d 1076 (Ala. 2000), the Supreme Court of Alabama discussed the fourth element of fraud, that the alleged misrepresentation be the cause of the injury complained of by the plaintiff, and recited the definition of causation found in the Alabama Pattern Jury Instructions:

> "The proximate cause of an injury is that cause which in the natural and probable sequence of events, and without the intervention of any new or independent cause, produces the injury and *without which* such injury would not have occurred."

*Boackle*, 770 So. 2d at 1081 (quoting APJI 33.00) (emphasis in original). Noting the converse of the foregoing, the Court pointed out that one way to view the issue of causation in regard to fraud is by asking whether the plaintiff has put forth evidence that he or she would have incurred the complained-of injury if the defendant had told (what the plaintiff believes to be) the truth concerning the material fact. *Id.*

All of Dillard's other arguments aside, the court is of the opinion that there is simply no evidence that Dillard's allegedly false statement concerning why it was transferring Byrd to cosmetics caused her the injury of which she complains: the transfer itself or her subsequent resignation. The fact of the matter is that if she was induced to resign by Dillard's, the inducement was her transfer to cosmetics, not anything Dillard's might have told her concerning why she was being transferred. In other words, Byrd has put forward absolutely no evidence that were she told what, in her mind, would have been the truth behind why she was being transferred to cosmetics, that Dillard's wanted to open up the AASM position for a younger individual, she would not have resigned her employment. On the contrary, the only evidence of record to which the parties have pointed the court is that

30

the only reason Byrd resigned her employment was because she was going to be transferred to the cosmetics department. The act that caused her to resign is and must be distinguished from the allegedly fraudulent reason given therefor.

The cases that Byrd cites in support of her claim do not dictate a contrary result and are easily distinguishable from the present situation. In *Smith v. Reynolds Metals Co.*, 497 So. 2d 93 (Ala. 1986), a summer employee who was discharged after it was found that she was not qualified for the position into which she had been hired was allowed to maintain a fraud action against her employer because there was evidence that in reliance upon the employer's pre-employment determination that she was in fact qualified for the position, she had turned down other opportunities for employment and schooling for the summer. *Smith*, 497 So. 2d at 95-96. In *Ramsay Health Care, Inc. v. Follmer*, 560 So. 2d 746 (Ala. 1990), the Alabama Supreme Court held that a jury question on fraud was presented by the plaintiff when he put forward evidence that he left his former job and took a position with the defendant in reliance upon the fraudulent representations of the defendant that he would be entitled to termination benefits if and when his employment with the defendant came to an end. *Follmer*, 560 So. 2d at 749-52. In *Kidder v. AmSouth Bank, N.A.*, 639 So. 2d 1361 (Ala. 1994), the Court, answering a certified question from the Northern District of Alabama, held that a defendant employer can be liable to a plaintiff for fraud if the plaintiff gave up her former employment and came to work for the defendant based upon fraudulent promises made by the defendant concerning working conditions. *Kidder*, 639 So. 2d at 1361-63. Finally, in *Forbus v. Sears Roebuck & Co.*, 958 F.2d 1036 (11th Cir. 1992), the Eleventh Circuit reversed a lower court's grant of summary judgment and held that a fraud

31

action brought by employees who had voluntarily entered into retirement contracts should go to the jury when there was evidence that they had been told by the employer that it was preparing to eliminate a number of jobs, when in fact this was not true, and that the retirement contracts offered by the employer contained better benefits than those to which the employees would have been entitled had their employment been terminated. *Forbus*, 958 F.2d at 1041-42.

The common thread between all of the above-cited cases is the fact than in each of them, the plaintiff took or declined to take a particular action in reliance upon, and because of, the allegedly false statement of the employer.  In other words, each plaintiff made a decision that he or she otherwise would not have made had he or she been told the truth by the employer rather than a lie.  In the present case, there is no evidence that Byrd stepped down from her position as AASM because she was given a false reason for having to do so.  She stepped down from that position because she was ordered to do so; there was no choice in the matter.  The fact that she may have been given a less than accurate reason justifying Dillard's decision to transfer her to cosmetics does not create the causation necessary to sustain a cause of action for fraud.  Further, the evidence indicates only one reason for her having decided to resign her employment: she did not want to work in cosmetics.  There is absolutely no evidence that had she been told the truth as to why she was being transferred, she would have decided to remain at Dillard's in the cosmetics department.  Because Byrd has pointed to no evidence that sustains the fourth element of fraud, her claim fails and summary judgment is due to be granted in Dillard's favor.

## V.    Conclusion.

The court finds that the defendant's motion for summary judgment is due to be granted in its entirety.  A separate order will be entered contemporaneously with this memorandum of opinion.

Done, this _30th_ of  May, 2002.

EDWIN NELSON
UNITED STATES DISTRICT JUDGE